Certiorari Granted, No. 31,750, July 30, 2009

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMCA-078**

**Filing Date: May 29, 2009**

**Docket No.  27,470**

**DONALD E. KILGORE and
CAROLE A. KILGORE,**

> **Plaintiffs-Appellants,**

**v.**

**FUJI HEAVY INDUSTRIES LTD.,
TAKATA CORPORATION, and
TAKATA SEAT BELTS INC.,**

> **Defendants-Appellees,**

**and**

**SUBARU OF AMERICA, INC.,**

> **Defendant.**

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY
Stephen D. Pfeffer, District Judge**

Peters & Lister, P.C.
Darrel Peters
Dearborn, MI

Comeau, Maldegen, Templeman & Indall, LLP
Grey Handy
Sharon W. Horndeski
Santa Fe, NM

for Appellants

Bowman and Brooke LLP

Thomas M. Klein
Phoenix, AZ

Rodey Dickason Sloan Akin & Robb, PA
Patrick M. Shay
Jeffrey M. Croasdell
Albuquerque, NM

for Appellees Fuji Heavy Industries Ltd.
and Takata Corporation

Bowman and Brooke LLP
David R. Kelly
Minneapolis, MN

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Martha G. Brown
Albuquerque, NM

for Appellee Takata Seat Belts Inc.

**OPINION**

**SUTIN, Judge.**

**{1}** This case centers on a defective seatbelt buckle claim in a vehicle rollover accident. Plaintiff Carole Kilgore was seriously injured. Plaintiff Donald Kilgore, her husband, was driving. The trial resulted in a defense verdict. Plaintiffs tried this case on the theory that the buckle design created a risk of accidental or inadvertent release, recognizing that the precise identification of what depressed the seatbelt buckle release button could never be known with certainty.

**{2}** More specifically, Plaintiffs sought to prove that the release button "was needlessly and dangerously exposed and demonstrably susceptible to unintended contact, opening the buckle and releasing the [seatbelt]." Their approach was to show that "such inadvertent contact could come from a hand, an elbow, or a variety of other objects loose in the passenger compartment of the car, which could have accidentally contacted and depressed the exposed button during a rollover collision." Plaintiffs' theories of recovery presented to the jury were negligence and product liability.

**{3}** Plaintiffs moved for a new trial. The district court denied the motion without a hearing. Plaintiffs assert reversible error in denying their motion for a new trial based on claims of juror misconduct, improper comments in Defendants' opening statement, and two erroneous evidentiary rulings. We hold these claims do not require a new trial. On juror

2

misconduct, we hold Plaintiffs failed to meet the preliminary requirement that they show there was a reasonable likelihood that extraneous information a juror received would have an effect on the verdict or on a typical juror and thus that there was a reasonable possibility that the information prejudiced Plaintiffs. We further hold that defense counsel's opening statement comments do not warrant a new trial. We also hold that the district court did not abuse its discretion in excluding evidence of other incidents or in allowing a defense expert's deposition testimony that the buckle in question could arguably meet certain test requirements. We therefore affirm the defense verdict.

{4}     The record proper in this case consists of thirty-two volumes consuming 5366 pages. There are thirty-two separate transcripts of various proceedings. Experts and other witnesses testified on the issues of negligence, product defect, and when, during the rollover, Mrs. Kilgore may have suffered the permanent spinal cord injury for which she seeks damages. Trial before a panel of twelve jurors took about three weeks. The jury's verdict was unanimous. Nothing presented to us in the briefs indicates that this was not a fully and professionally tried case.

**BACKGROUND**

{5}     Mr. Kilgore was driving a 1998 Subaru Legacy Outback wagon at the time of the accident. Mrs. Kilgore was in the back seat behind Mr. Kilgore, and their seven-year-old granddaughter was in the front passenger seat. All were wearing their seatbelts. The car went out of control, rolled over, and landed upside down at the bottom of an embankment. Mr. Kilgore and his granddaughter remained belted and were hanging upside down, suspended in their seatbelts. They did not suffer serious injuries. Mrs. Kilgore was found lying on the roof, facing up toward the sky, and was not suspended by her seatbelt. No direct evidence was presented as to how Mrs. Kilgore came to be unbelted.

{6}     Plaintiffs sued Fuji Heavy Industries Ltd. (Fuji), which designed the car; and Takata Corporation (Takata) and Takata Seatbelts, Inc. (Takata Seatbelts), which designed and manufactured, respectively, the car's seatbelt system. Plaintiffs contended that the Takata AB buckle in the Subaru's seatbelt system was negligently designed, tested, and selected and was defective because it accidentally or inadvertently unlatched during the rollover, resulting in a permanent spinal cord injury that left Mrs. Kilgore a ventilator-dependent quadriplegic. Obvious questions for the jury were at what point did the buckle release and what likely caused it to release. We refer to Fuji, Takata, and Takata Seatbelts, together, as Defendants.

{7}     The jury was instructed that to establish negligence on the part of Defendants, Plaintiffs had the burden of proving that Fuji failed to exercise ordinary care in designing, testing, or selecting the seatbelt system and that Takata failed to exercise ordinary care in designing and testing the seatbelt system. The jury was also instructed that, to establish a claim of defective product on the part of Defendants, Plaintiffs had the burden of proving that the seatbelt system created an unreasonable risk of injury to Mrs. Kilgore and that the seatbelt system was defective when it reached the user or consumer.

3

**{8}**    The jury rendered a special verdict in favor of Defendants.  The jury specifically found that Fuji was not negligent in designing, testing, or selecting the seatbelt system and that Takata was not negligent in designing or testing the seatbelt system.  The jury also specifically found that no negligence of Fuji or Takata was a cause of Mrs. Kilgore's spinal cord injury and related damages.  In addition, the jury specifically found that the seatbelt system in Plaintiffs' car that was supplied by Defendants was not defective. The verdict was rendered on September 29, 2006, and the court entered a final judgment on the verdict and in Defendants' favor on December 11, 2006.

**{9}**    A legal assistant for Plaintiffs' counsel conducted an investigation into the jury's verdict from October through December 2006 that discovered a juror had received extraneous information.  Based on this discovery and also on alleged prejudicial error in evidentiary rulings, Plaintiffs filed a motion for a new trial on December 22, 2006.  Accompanying the motion was Plaintiffs' thirty-six page memorandum containing twenty-six exhibits.  Plaintiffs appeal the court's denial of that motion.

**DISCUSSION**

**Juror Misconduct**

**{10}**    Through the post-verdict investigation, Plaintiffs learned that one juror, likely early in the trial, spoke to the owner of a Subaru-specific repair shop, Michael Griego (the owner), where the juror's brother worked as a mechanic.  Plaintiffs then presented to the court an affidavit of the owner dated December 12, 2006.  In its entirety, the affidavit states:

> The affiant, Michael Griego[,] first being duly sworn deposes and says as follows:
>
> 1.    My name is Michael Griego.  I am an adult and I am competent to make this affidavit.  The facts stated in this affidavit are true and are based upon my own personal knowledge.
>
> 2.    I read an article in the newspaper about the trial in Santa Fe in which a woman was suing Subaru because she was paralyzed in a rollover accident because her [seatbelt] came off.  I believe the article was in September of [2006].
>
> 3.    I am the owner of Mike's Garage at 1501 5[th] St., Santa Fe, New Mexico.  My shop only works on Subaru vehicles.  Michael Lucero is an employee of my business.
>
> 4.    Marie Millie Valdivia is Michael Lucero's sister.

4

5. Prior to my seeing the newspaper article about the Subaru trial, Ms. Valdivia and I had a conversation. She told me that she was a juror on the Subaru trial. I told her I had never heard of any incident where a Subaru [seatbelt] buckle had come open accidentally. I told her that I had never heard of that happening.

6. During the conversation, she said to me, at least twice, that she was not supposed to be talking to me about the case.

Plaintiffs' motion for a new trial was in part based on their view that the juror engaged in misconduct as shown by the conversation described in the owner's affidavit.

**Standard of Review**

**{11}** "The essence of cases involving juror . . . misconduct . . . is whether the circumstance[s] unfairly affected the jury's deliberative process and resulted in an unfair jury." *State v. Mann*, 2002-NMSC-001, ¶ 20, 131 N.M. 459, 39 P.3d 124. We will not overturn a district court's denial of a motion for a new trial based on juror misconduct unless the court abused its discretion. *Id.* ¶ 17. An abuse of discretion in this context occurs if the court's ruling is arbitrary, capricious, or beyond reason. *Id.* The district court is in the best position to decide whether to grant a new trial. *Id.*

**The Affidavit's Shortcomings**

**{12}** The owner's affidavit constitutes the sole evidence Plaintiffs presented to the court as evidence of the juror's conduct relating to the receipt of extraneous information. The circumstances set out in the owner's affidavit are not, in our view, to be characterized as "jury tampering," as occurs when a person purposefully initiates contact with a juror and then says something to influence the juror. *See id.* ¶¶ 20-21 (discussing cases involving jury tampering). Nor does this case involve "juror bias." *See id.* ¶¶ 20-21, 25-26. Further, the contact here was not equal to unauthorized social visits with court personnel or lawyers involved in the case. *Compare Gonzales v. Surgidev Corp.*, 120 N.M. 133, 148, 899 P.2d 576, 591 (1995) (deciding not to reach whether a bailiff's lunch with the plaintiff fell within the category of extraneous prejudicial information because it was shown that no prejudice resulted), *with State v. Pettigrew*, 116 N.M. 135, 140, 860 P.2d 777, 782 (Ct. App. 1993) (determining that the court did not commit reversible error in excusing a seated juror for the appearance of impropriety when the juror was seen leaving in his vehicle with an intern from the public defender's office during a recess in the trial). The owner's affidavit is unclear as to whom initiated a discussion in regard to seatbelt buckles. Were it shown that the juror asked the owner about seatbelt buckles unlatching, this case would appear to fall more in line with what our Supreme Court in *Mann* characterized as misconduct, which involved the initiation of a conversation by a juror with another person in an attempt to obtain information relevant to the case contrary to the instructions of the court. *See* 2002-NMSC-001, ¶¶ 22,

5

24 (discussing juror misconduct and distinguishing between knowledge of extraneous facts that are and that are not directly related to the specific case).

**{13}** The affidavit shows only that a conversation occurred in which the juror told the owner that she was a juror in "the Subaru trial," that the owner said he had never heard of an incident of a buckle opening accidentally, and that the juror indicated that she was not supposed to be talking to the owner about the case. The affidavit does not specifically state the sequence of the statements in the conversation and it gives no clue as to what caused the owner to say what he did or what motivated the juror to say what she did. The affidavit does not expressly state that the juror initiated the conversation. If we assume she did, all we would know is that she said that she was a juror in the Subaru trial. Without more, we will not conclude that the juror disobeyed an instruction of the court not to discuss case-related issues or facts with others. Nevertheless, the juror did receive extraneous information relating to an issue in the case.

**Presumption of Prejudice and Preliminary-Showing Requirement**

**{14}** In determining whether a new trial is required based on the juror's receipt of extraneous information, we look at whether the information that was imparted to the single juror gave rise to a presumption of prejudice requiring Defendants to rebut the presumption or at least requiring the district court to hold an evidentiary hearing and to question one or more jurors. Early in New Mexico criminal law, our Supreme Court established a presumption of prejudicial error in relation to a court's communication with the jury. *See State v. Beal*, 48 N.M. 84, 89-94, 146 P.2d 175, 178-82 (1944) (holding that reversible error occurred upon a showing that the court improperly communicated with the jury regarding the case after the matter had been submitted to the jury, and the communication was not in the presence of the parties in open court). The Court in *Beal* emphasized that once the improper communication was shown, the burden was not on the appellant who was claiming prejudice to show prejudice, but instead was on the appellee who was claiming that there was no prejudice to overcome the presumption of prejudicial error by showing a lack of prejudice. *Id.* at 91-92, 94, 146 P.2d at 180, 181-82.

**{15}** Ten years after *Beal*, in *Remmer v. United States*, the United States Supreme Court broadly stated that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties." 347 U.S. 227, 229 (1954). In *Remmer*, the impropriety involved jury tampering, in that a person remarked to a juror that the juror could profit by bringing in a verdict favorable to the defendant. *Id.* at 228.

**{16}** In *State v. Doe*, 101 N.M. 363, 365, 367, 683 P.2d 45, 47, 49 (Ct. App. 1983), this Court discussed the *Beal* presumption in connection with a newspaper story regarding witness intimidation that came to a juror's attention during a recess. This Court did not

6

determine whether the communication constituted prejudicial extraneous information that reached the jury; rather, the matter was remanded for a hearing for findings on "whether extraneous information reached the jury" and "whether the extraneous information prejudiced the jury." *Doe*, 101 N.M. at 366, 683 P.2d at 48. In stating that the burden is on the movant to obtain a new trial, this Court stated:

> The party seeking a new trial on the basis that extraneous evidence reached the jury must make a preliminary showing that movant has competent evidence that material extraneous to the trial actually reached the jury. If the party makes such a showing, and if there is a reasonable possibility the material prejudiced the defendant, the trial court should grant a new trial. The trial court has a duty to inquire into the possibility of prejudice. In an appropriate case, the trial court should conduct an evidentiary hearing.

*Id.* (citations omitted). Our Supreme Court confirmed this approach in *Mann*. *See Mann*, 2002-NMSC-001, ¶ 19.

**{17}** The presumption expressed in *Beal* and *Doe* has continued in New Mexico in both criminal and civil cases in various contexts. Criminal cases: *see, e.g.*, *State v. Sanchez*, 2000-NMSC-021, ¶¶ 23-24, 129 N.M. 284, 6 P.3d 486 (involving the post-submission substitution of a juror); *State v. Sena*, 105 N.M. 686, 687-88, 736 P.2d 491, 492-93 (1987) (involving a juror's statement during deliberations about guilt of the defendant and that this view was not based on anything the juror heard in the courtroom); *State v. McCarter*, 93 N.M. 708, 711, 604 P.2d 1242, 1245 (1980) (involving the court's communication with the jury in the absence of the defendant); *State v. Melton*, 102 N.M. 120, 123, 692 P.2d 45, 48 (Ct. App. 1984) (involving a jury's consideration of dictionary definitions); *State v. Gutierrez*, 78 N.M. 529, 530, 433 P.2d 508, 509 (Ct. App. 1967) (involving an unknown person who brushed against a juror during a break and told the juror "to make a wise decision," which was presented to the court before jury deliberations). Civil cases: *see, e.g.*, *Goodloe v. Bookout*, 1999-NMCA-061, ¶ 20, 127 N.M. 327, 980 P.2d 652 (involving jurors discussing personal knowledge of facts among themselves during deliberations); *Hurst v. Citadel, Ltd.*, 111 N.M. 566, 570-71, 807 P.2d 750, 754-55 (Ct. App. 1991) (involving a bailiff's misstatement of law to the jury); *Prudencio v. Gonzales*, 104 N.M. 788, 789-90, 727 P.2d 553, 554-55 (Ct. App. 1986) (involving a bailiff's direct and inappropriate contact with jurors); *Budagher v. Amrep Corp.*, 100 N.M. 167, 171, 667 P.2d 972, 976 (Ct. App. 1983) (involving an improper set of instructions in the jury room and the court noting a number of improper-communication-with-jury cases in New Mexico since *Beal*, applying the presumption-of-prejudice test and determining that the error in the case at hand was "serious" and that the presumption was supported by the record).

**{18}** We note that, in *Mann*, our Supreme Court specifically indicated that the United States Supreme Court has distanced itself from *Remmer*'s presumption of prejudice. *Mann*, 2002-NMSC-001, ¶ 36; *see also Goodloe*, 1999-NMCA-061, ¶ 20 (noting *United States v.*

*Sylvester*, 143 F.3d 923, 933-34 (5th Cir. 1998), as suggesting that the *Remmer* presumption has been abandoned by the United States Supreme Court). However, *Mann* found it "unnecessary to reconcile existing New Mexico precedent with this more recent articulation by the Supreme Court." 2002-NMSC-001, ¶ 36. In the present case, Defendants claim that a majority of jurisdictions have now rejected a presumption of prejudice in civil cases. Defendants do not, however, ask this Court to reconcile existing New Mexico precedent with what may be a change in the law in the federal courts and perhaps in other states. We do not attempt any such reconciliation in this opinion.

**{19}** As New Mexico law stands, the presumption of prejudice does not arise unless a sufficient preliminary or threshold showing is made to invoke it. This Court indicated in our most recent civil case on juror misconduct that "rather than stating that courts always presume prejudice, it may be more accurate to state that the threshold question for the trial court is whether the unauthorized conduct creates a presumption of prejudice." *Goodloe*, 1999-NMCA-061, ¶ 20 (internal quotation marks and citation omitted). This includes consideration of whether "there is a reasonable probability or a likelihood that the extrinsic communications or conduct would have an effect upon the verdict or upon the typical juror." *Id*. (internal quotation marks and citation omitted). This Court further stated that "courts apply common sense to evaluate the likelihood of prejudice arising from the communication." *Id.* Similar to *Goodloe*'s "threshold question" is language in *Doe*, repeated in *Mann*, that the new-trial movant who asserts juror misconduct "must make a preliminary showing [with] competent evidence that . . . extraneous [information] actually reached the jury." *Mann*, 2002-NMSC-001, ¶ 19 (internal quotation marks and citation omitted); *Doe*, 101 N.M. at 366, 683 P.2d at 48.

**When Extraneous Information Is Brought to the District Court's Attention**

**{20}** The preliminary-showing requirement in *Doe* and *Mann*, and *Goodloe*'s threshold-question requirement, indicate that upon receipt of the evidence of juror receipt of extraneous information the district court is to make an assessment whether evidence exists that requires invocation of the presumption-of-prejudice error. *See also Budagher*, 100 N.M. at 172, 667 P.2d at 977 (determining as a threshold matter that misconduct was "serious" and that the presumption was supported by the record). As *Mann* indicates, we should focus on whether extraneous information "unfairly affected the jury's deliberative process and resulted in an unfair jury." 2002-NMSC-001, ¶ 20; *see also Goodloe*, 1999-NMCA-061, ¶ 20 (stating that the court is to consider whether there was "a reasonable probability or a likelihood that the extrinsic [information] would have an effect upon the verdict or upon a typical juror" (internal quotation marks and citation omitted)); *Doe*, 101 N.M. at 366, 683 P.2d at 48 (stating that if a party makes the required preliminary showing and "if there is a reasonable possibility the material prejudiced the defendant, the trial court should grant a new trial"). We make no distinction between "preliminary" and "threshold," and from here on we use "preliminary." Defendants contend that Plaintiffs failed to make the requisite preliminary showing and, therefore, the evidence did not give rise to a presumption of

prejudice or require the district court to conduct any inquiry or have an evidentiary hearing. We address this point.

**{21}** A juror's testimony or affidavit in regard to the juror's or the jury's deliberations are forbidden under Rule 11-606(B) NMRA. Thus, while under Rule 11-606(B), evidence of "extraneous prejudicial information . . . brought to the jury's attention" can be shown by a juror's testimony or affidavit, courts must make decisions in regard to a mistrial or a new trial without the benefit of knowing the jury's deliberations. The court must instead base its ruling on the likelihood that potentially prejudicial, extraneous information "actually reached the jury." *See Mann*, 2002-NMSC-001, ¶ 19. The difficulty of making that ruling, however, does not end the inquiry.

**{22}** New Mexico cases have not specifically analyzed whether one juror's receipt of extraneous information is sufficient to invoke the presumption of prejudice where there is no evidence that the extraneous information actually reached other members of the jury. *Mann* states that the district court is to assess whether the evidence indicates "that material extraneous to the trial actually reached the jury." 2002-NMSC-001, ¶ 19; *see also* Rule 11-606(B) (stating that a juror may testify as to "whether extraneous prejudicial information was improperly brought to the jury's attention"); *Doe*, 101 N.M. at 366, 683 P.2d at 48 ("The party seeking a new trial on the basis that extraneous evidence reached the jury must make a preliminary showing that movant has competent evidence that material extraneous to the trial actually reached the jury.").

**{23}** A bit differently, this Court in *Goodloe* and *Prudencio* stated that courts are to determine "whether there is a reasonable probability or a likelihood that the extrinsic communications or conduct would have an effect upon the verdict or upon a typical juror." *Goodloe*, 1999-NMCA-061, ¶ 20 (internal quotation marks and citation omitted); *Prudencio*, 104 N.M. at 790, 727 P.2d at 555. Furthermore, *Remmer* states that "any private communication . . . with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." 347 U.S. at 229. In addition, one decision of this Court might be construed as supporting a holding that extraneous information obtained or received by one juror can be presumptively prejudicial although there is no evidence that other jurors were affected. *See Pettigrew*, 116 N.M. at 140, 860 P.2d at 782 (determining that a juror's unauthorized contact with an intern from the public defender's office that created an appearance of impropriety was presumptively prejudicial).

**Lack of Sufficient Preliminary Showing**

**{24}** We need not try to resolve the foregoing issue because we think the evidence in the present case falls short of the required preliminary showing. To begin with, a reasonable inference can be drawn from the affidavit that the juror was conscious of her duty not to investigate on her own or to seek information outside of the evidence. The owner's affidavit does not say or contain facts that directly show that the juror sought from the owner specific facts about the type of seatbelt buckle in question. Also, at the start of trial, the court

9

instructed the jury as to "a number of important rules governing your conduct during the trial." The jury was told that during recesses and adjournments, while the case was in progress, "do not discuss the case with anyone other than yourselves." Jurors were informed that in order to "minimize the risk of accidentally overhearing something that is not in evidence in this case," jurors were to wear their jury badges around the courthouse. Jurors were admonished that "[t]hough it is natural to visit with people you meet, please do not talk with any of the attorneys, parties, witnesses or spectators either in or out of the courtroom." Of particular importance, the court instructed the jurors to "not consider anything you may have read or heard about this case outside the courtroom." The jurors were told not to "attempt to research, test, experiment, visit[] . . . any location involving this case or any other investigation" and that "[s]uch conduct also runs contrary to the rule that your verdict must be based solely upon the evidence presented to you." The court impressed upon jurors not to attempt to decide the outcome of the case before final deliberations. Further, the jurors were told that the rules the court was giving the jurors "apply at all times during the trial."

**{25}** During and after trial the court gave further instructions to the jury. At certain breaks during trial, the district court instructed the jurors not to discuss the case with anyone, to report any discussions of the case in the presence of a juror, and to avoid forming a fixed opinion about the case before deliberations. At the close of the trial, the court instructed the jury that it was their "duty to determine the true facts from the evidence produced here in open court" and that their "verdict should not be based on speculation, guess or conjecture."

**{26}** We presume that the jurors followed the instructions given by the court. *See State v. Benally*, 2001-NMSC-033, ¶ 21, 131 N.M. 258, 34 P.3d 1134 ("We presume that the jury followed the instructions given by the trial court, not the arguments presented by counsel."); *State v. Smith*, 2001-NMSC-004, ¶ 40, 130 N.M. 117, 19 P.3d 254 (observing that the jury was instructed not to draw any inference of guilt from the fact that the defendant did not testify and that such fact should not be discussed by the jurors or enter into their deliberations in any way, and stating that "[j]uries are presumed to have followed the written instructions"); *State v. Case*, 100 N.M. 714, 719, 676 P.2d 241, 246 (1984) (stating that there is a presumption that the jury will adhere to the court's admonition that they will not discuss the case or the evidence with anyone, and they will keep an open mind until the case is completed and submitted); *State v. Sellers*, 117 N.M. 644, 650, 875 P.2d 400, 406 (Ct. App. 1994) (stating that "[t]here is a presumption that the jury follows the instructions they are given").

**{27}** The owner's affidavit states that the juror in question indicated to the owner "at least twice, that she was not supposed to be talking to me about the case." This indicates that the juror was aware of the court's instructions. The affidavit does not present facts that show that the juror actually violated any instruction. And there is nothing in evidence showing that she actually breached any duty or engaged in misconduct in relation to the statements between herself and the owner.

10

**{28}** Further, the owner's affidavit does not state that he knew or was informed about the facts in the present case other than, it would appear, that a seatbelt buckle in a Subaru vehicle was involved. There exists only the owner's bare statement that he had not heard of an accidental unbuckling. This was not a definitive statement, nor was it an opinion, as to whether the buckle could or could not accidentally or inadvertently open or had never opened under circumstances analogous to those in the present case or, for that matter, under any circumstance. Plaintiffs did not present to the court any foundational statements from the owner in regard to his knowledge and experience relating to defective AB buckles in Subarus. Moreover, the owner's statement seems almost inconsequential in comparison to the substantial testimony at trial, including expert testimony, relating to whether the buckle was negligently designed or was defective and how the buckle may have opened. In addition, Plaintiffs were unable in this case to present evidence of an accidental unbuckling from any particular object, such as a hand, elbow, or other object loose in the vehicle. As we indicated earlier in this opinion, the juror heard the owner's statement fairly early in the trial, before or during the extensive testimony about seatbelts, and well before the jury's deliberations.

**{29}** Plaintiffs mention the juror's failure to report to the court what the owner said. In their memorandum in support of their motion for a new trial, Plaintiffs stated that this failure to report compounded "the problem" because, had the court known what the owner stated, it could have addressed the issue during trial. In oral argument before this Court, Plaintiffs' counsel appeared to indicate that the failure to report was misconduct that would require a new trial. We reject these notions insofar as they are intended to constitute rationales for a new trial. We are supplied no argument or authority to support them. As well, even were the failure to report relevant to some issue in this case, one can only speculate as to what the juror might have reported and how the court would have handled the report.

**{30}** Based on the foregoing discussion, we doubt that there was a reasonable likelihood that the owner's statement had a significant effect on the juror's vote in the present case. Nor is there any reason to believe that the owner's statement reached another member of the jury. There exists no evidence from which such an inference can be reasonably drawn. *Cf. Saucedo v. Winger*, 850 P.2d 908, 914 (Kan. 1993) (stating that if a juror's misconduct is "not such as to influence the jury, the misconduct will not vitiate a verdict[,] [b]ut if facts outside of the evidence are brought before the jury based on the personal knowledge of a juror and those facts are likely to have influenced the minds of other jurors, the verdict should be set aside"). We are aware that a rational counter-argument is that there is no evidence to the contrary, that is, no evidence that the juror did not discuss the information with one or more other jurors. Nevertheless, we see nothing in the owner's statement that requires us to conclude that the juror would have thought so strongly about the matter or have thought the information sufficiently significant that she likely would have conveyed the information to other jurors.

**{31}** With nothing before us beyond what is in the owner's affidavit, we hold that Plaintiffs did not sustain their burden to preliminarily show there was a reasonable likelihood

11

that the information would have an effect on the verdict or even on a typical juror. We cannot conclude that there was a reasonable possibility that the information prejudiced Plaintiffs. Thus, a presumption of prejudice did not arise in this case.

**Question of Evidentiary Hearing or District Court Investigation**

**{32}** Plaintiffs nevertheless contend that they are entitled to a new trial because the district court failed to hold an evidentiary hearing or otherwise investigate once presented with the owner's affidavit. We disagree and hold that the court was not required to conduct an evidentiary hearing or to otherwise investigate further when Plaintiffs failed to make the required preliminary showing. *Mann*, 2002-NMSC-001, ¶ 19; *State v. Chamberlain*, 112 N.M. 723, 733, 819 P.2d 673, 683 (1991) (holding that the district court did not abuse its discretion by denying a motion for further inquiry because there was no evidence that new evidentiary facts reached the jury during deliberations); *Sena*, 105 N.M. at 688, 736 P.2d at 493 (holding that the district court did not abuse its discretion by denying a motion for an evidentiary hearing because the affidavit alleging misconduct "does not indicate that extraneous material reached the jury").

**{33}** Furthermore, in the face of Defendants' argument that Plaintiffs failed to request an evidentiary hearing, Plaintiffs have not shown that they requested the court with any degree of specificity to investigate, to call jurors in for questioning, or to schedule an evidentiary hearing because Plaintiffs intended to present testimony in support of their claim of misconduct. In support of their contention that they did request an evidentiary hearing, Plaintiffs assert that when they submitted a December 22, 2006, hearing package to the district court relating to their motion for a new trial, they stated in a cover letter the "possible need for an evidentiary hearing on the juror misconduct issue."

**{34}** Nothing in Plaintiffs' hearing package or in their motion for a new trial and supporting memorandum discusses the need for or specifically asks the court to hold an evidentiary hearing on the juror-misconduct issue. Nor is there any request in these documents that the court investigate or call jurors in, and there is no discussion about or authority showing a duty on the part of the court to do so. A party serious about an evidentiary hearing on a juror-misconduct issue surely would proceed more forcefully than to merely indicate a "possible need for an evidentiary hearing." Further, in a separate request for hearing, Plaintiffs requested only one and one-half hour for a hearing on the entirety of their motion for a new trial and said nothing about the need for an evidentiary hearing on the juror-misconduct issue. We see nothing in the record or briefs indicating that Plaintiffs alerted the district court or Defendants that Plaintiffs intended to subpoena jurors or others or to ask the court to do so.

**{35}** At no time after December 22, 2006, did Plaintiffs request an evidentiary hearing or request the court to conduct any sort of investigation. On January 17, 2007, one day after Defendants' responses to Plaintiffs' motion for a new trial were filed, Plaintiffs submitted a request for an expedited hearing on their motion for a new trial. This request, which

12

reduced the estimated hearing time to only one hour, did not mention or in any way alert the district court that Plaintiffs wanted an evidentiary hearing specifically on the juror-misconduct issue. On the same date, the court denied Plaintiffs' motion for a new trial without granting the hearing Plaintiffs had requested.

**{36}** Plaintiffs nonetheless assert that "[t]he trial court has a duty to inquire into the possibility of prejudice" and that "[i]n an appropriate case, the trial court should conduct an evidentiary hearing." *Doe*, 101 N.M. at 366, 683 P.2d at 48. We agree that a district court has a duty in the appropriate case to conduct such an evidentiary hearing. *See id.* However, we are not persuaded that this is the appropriate case or that the court abused its discretion when it did not schedule an evidentiary hearing or otherwise investigate further on the juror-misconduct issue.

**{37}** Given the thinness of the affidavit evidence presented to the district court, we think it was incumbent on Plaintiffs to at the very least have provided foundational evidentiary support beyond what was in the owner's affidavit. In fact, Plaintiffs' counsel's law firm had a legal assistant who had sat through the entire trial make "numerous attempts to contact jurors" after the trial. The legal assistant stayed in Santa Fe for several days following trial for this purpose. He traveled several times from Detroit, Michigan, the law firm's place of business, to Santa Fe to explore information regarding the juror who spoke to the owner of the Subaru repair shop, and ultimately obtained the owner's signature on the affidavit. As far as we can discern from the record, Plaintiffs failed to provide any explanation to the district court regarding the legal assistant's or anyone else's attempts to contact any jurors other than the juror in question. Without more for the court to go on, and without Plaintiffs having specifically requested the court to call jurors in, to otherwise explore the matter further, or to hold an evidentiary hearing, we cannot say that the court abused its discretion in not proceeding on its own to obtain the presence of jurors to testify or to otherwise investigate or hold an evidentiary hearing, or in denying the motion for a new trial on the extraneous information.

**Exclusion of Evidence of Other Incidents and Complaints**

**{38}** In their case in chief, in anticipation of defense witness testimony, Plaintiffs sought to show, through an expert witness, four incidents or occurrences in the form of lawsuit claims involving "real world accidents and claims of AB buckles opening." The court did not allow the evidence. Plaintiffs appeal the court's exclusion of the evidence.

**{39}** "Admission or exclusion of evidence is a matter within the discretion of the trial court and the court's determination will not be disturbed on appeal in the absence of a clear abuse of that discretion." *Coates v. Wal-Mart Stores, Inc.*, 1999-NMSC-013, ¶ 36, 127 N.M. 47, 976 P.2d 999 (internal quotation marks and citation omitted). We review the admission or exclusion of evidence for abuse of discretion. *Hourigan v. Cassidy*, 2001-NMCA-085, ¶ 21, 131 N.M. 141, 33 P.3d 891. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *Coates*, 1999-

13

NMSC-013, ¶ 36 (internal quotation marks and citation omitted).  Furthermore, an abuse of discretion will be found only if we can characterize the district court's ruling "as clearly untenable or not justified by reason."  *Id.* (internal quotation marks and citation omitted).  "When there exist reasons both supporting and detracting from a trial court decision, there is no abuse of discretion."  *State v. Moreland*, 2008-NMSC-031, ¶ 9, 144 N.M. 192, 185 P.3d 363 (internal quotation marks and citation omitted).  "We do not find an abuse of discretion unless the court's ruling exceeds the bounds of all reason or is arbitrary, fanciful or unreasonable."  *Mayeux v. Winder*, 2006-NMCA-028, ¶ 34, 139 N.M. 235, 131 P.3d 85 (filed 2005) (internal quotation marks and citation omitted).  If evidence is erroneously admitted or excluded, the complaining party must show prejudice to obtain a reversal.  *See id.* ¶ 37.  "[W]e will reverse the trial court only when it is clear that the court has abused its discretion."  *Behrmann v. Phototron Corp.*, 110 N.M. 323, 327, 795 P.2d 1015, 1019 (1990).

**{40}**  Plaintiffs claim that without the evidence of what they contend are similar real-world accidents in which AB buckles opened, they were unable to defend against the anticipated defense witness testimony "that 169 million AB buckles had been manufactured representing 'tens of millions of . . . cars years of exposure or experience'"; "that AB buckles do not release . . . in real[-]world accidents"; "that the vehicle and buckle manufacturers had procedures by which they would learn about any problems with their vehicles or [seatbelts] and that there was not a single report of an AB [seatbelt] buckle ever releasing in any accident and that it could never happen in the 'real world'"; and "that 'Takata has manufactured many buckles . . . and we have never heard [of] a buckle opening in the marketplace.'"  Plaintiffs' purpose was to show that Defendants did have notice of AB buckles opening and to thereby rebut the aforementioned anticipated defense testimony.  Plaintiffs go a bit too far in their brief in chief claiming they could not give the jury important evidence on the likelihood of injury or the risk of injury resulting from the condition of the buckle as they are entitled to do pursuant to UJI 13-1406 NMRA.  This is not the evidence they sought to present.  Our review of the transcript of the hearing on this issue indicates that Plaintiffs' stated purpose of offering the evidence was solely "to show that indeed there are claims out in the world, there are allegations of buckle openings against Takata customers involving this buckle" and was intended to rebut Defendants' evidence as to not having received notice of such claims from customers.

**{41}**  According to Plaintiffs, one of their expert witnesses was prepared to testify that he conducted investigations in respect to the four cases and concluded that Takata AB buckles had released during the crash.  In their briefs on appeal, Plaintiffs nowhere specifically describe any details, variables, or other aspects relating to these claimed similar incidents or to their expert's anticipated testimony.  Plaintiffs appear to leave it to this Court to search the record and to analyze and set out details as to the incidents and Plaintiffs' positions and arguments.  We choose not to do so.  "We are not obligated to search the record on a party's behalf to locate support for propositions a party advances or representations of counsel as to what occurred in the proceedings."  *Muse v. Muse*, 2009-NMCA-003, ¶ 42, 145 N.M. 451, 200 P.3d 104 (filed 2008); *see Bintliff v. Setliff*, 75 N.M. 448, 450, 405 P.2d 931, 932 (1965) (determining that our Supreme Court would not consider the argument of the appellant's

counsel due to the failure to provide specific references to the record in violation of a Supreme Court rule); *Murken v. Solv-Ex Corp.*, 2005-NMCA-137, ¶ 14, 138 N.M. 653, 124 P.3d 1192 ("[W]e decline to review . . . arguments to the extent that we would have to comb the record to do so."); *In re Estate of Heeter*, 113 N.M. 691, 694, 831 P.2d 990, 993 (Ct. App. 1992) ("This [C]ourt will not search the record to find evidence to support an appellant's claims.").

**{42}** All Plaintiffs offered were four occurrences that were the subjects of four lawsuits that never went to trial and that consisted of claims that were never proved. Defendants show that the claimed occurrences involved different vehicles and other crash-related variables and that there were no conclusions as to any one cause of a buckle opening. The district court determined that the proposed evidence had "tenuous relevance to the purpose for which it would be offered as well as the prejudice would outweigh the probative value and could become an inefficient presentation of evidence."

**{43}** Plaintiffs' briefing is insufficient to persuade us that the circumstances of the four cases are sufficiently probative to hold that the district court abused its discretion in excluding the cases from consideration. The appellate courts afford the district courts wide latitude and discretion in deciding whether the prejudicial impact of tendered evidence outweighs its probative value. *See State v. Coffin*, 1999-NMSC-038, ¶ 35, 128 N.M. 192, 991 P.2d 477; *Norwest Bank N.M., N.A. v. Chrysler Corp.*, 1999-NMCA-070, ¶ 39, 127 N.M. 397, 981 P.2d 1215. Furthermore, the district court has discretion to reject evidence with tenuous relevance because of the inordinate time and efficiency that could be lost in conducting what might essentially be separate trials on the other occurrences. *See Moe v. Avions Marcel Dassault-Breguet Aviation*, 727 F.2d 917, 935 (10th Cir. 1984) (affirming a district court's conclusion that "certain tenders of evidence of other flight incidents, after the crash [in question], would constitute a mini-trial within a trial, resulting in undue delay, waste of time, and needless presentation of cumulative evidence" contrary to Federal Rule of Evidence 403). We reject what appears to be Plaintiffs' argument that they were entitled to show little more than AB buckles allegedly opening in four other lawsuits.

**{44}** In addition to attempting to present the foregoing evidence of other incidents, in cross-examining a defense expert, Plaintiffs also sought to use complaints which consisted of verbal claims made by consumer call-in to a National Highway Transportation Safety Administration "hotline" about buckle release in vehicles with Takata AB seatbelts. Plaintiffs state that a defense expert testified "about the process by which consumer complaints about [seatbelts] are passed on to vehicle manufacturers through a [nationwide] 'Hot Line'" and that a Subaru engineer "testified that he had 'never heard of any instance or incident where the [seatbelt] in our vehicle released an occupant.'" According to Defendants, Plaintiffs sought to use three complaints to counter that testimony. The court determined that this evidence was of limited, if any, relevance and that its probative value was outweighed by prejudice and confusion.

15

**{45}**     Again, Plaintiffs nowhere detail in their briefs of what the complaints specifically consisted or how the claims and circumstances were substantially similar to Plaintiffs' claims and the circumstances in the present case.  Also problematic is that it appears that no evidence indicated that any complaint was confirmed or investigated.  It is unclear whether the circumstances and seatbelts involved were shown to be similar to those in the present case.  Again, we will not comb the record to find evidence to support a party's position on appeal.  *Muse*, 2009-NMCA-003, ¶ 42; *see Bintliff*, 75 N.M. at 450, 405 P.2d at 932; *Murken*, 2005-NMCA-137, ¶ 14; *In re Estate of Heeter*, 113 N.M. at 694, 831 P.2d at 993.  And again, based on what Plaintiffs have set out in their briefs, the district court did not abuse its discretion in precluding use of the hotline complaints.

**{46}**     In sum, Plaintiffs' general, broad-swathe assertions of exclusion of evidence of allegedly similar incidents and hotline complaints are insufficient to sustain Plaintiffs' contention that the district court abused its discretion, and do not pass muster under our briefing rules.  From what Plaintiffs have presented in their briefs, we hold that the court could rationally and reasonably have found, as it did, that the evidence had only tenuous or limited relevance, if any, that prejudice outweighed probative value, and that admission of the evidence would cause inefficiency, if not also confusion, in the trial.  *See* Rule 11-403 NMRA; *Olson v. Ford Motor Co.*, 481 F.3d 619, 623 (8th Cir. 2007) (stating, in a product-liability case involving a vehicle's unexpected acceleration and power-brake system, that the reason for the "extremely deferential standard of review" under federal Rule 403 is that the ruling "depends on factors that are uniquely accessible to the trial judge who is present in the courtroom and uniquely inaccessible to an appellate judge who must take the case on a cold record"); *C.A. Assoc. v. Dow Chem. Co.*, 918 F.2d 1485, 1489 (10th Cir. 1990) (stating, in a product-liability case involving a masonry mortar additive, that in federal Rule 403 rulings, the deference accorded "to the trial judge who is most familiar with the circumstances . . . is particularly fitting in lengthy trials involving [a] magnitude of highly technical expert testimony" (citation omitted)).

**Surprise Theory in Opening Statement**

**{47}**     During trial, Plaintiffs filed an expedited motion in limine to exclude any evidence, whether from a defense expert or otherwise, on what Plaintiffs considered to be a "surprise theory" of the defense, which they asserted was first asserted in Defendants' counsel's opening statement to the jury.  The surprise theory about which Plaintiffs complained below and now complain on appeal is embodied in the following statements of defense counsel relating to Mrs. Kilgore:  After saying that somebody unbuckled Mrs. Kilgore's seatbelt after the car stopped, then asking the question, "Who?", and finally suggesting it could have been one among "a lot of people at the scene who left," defense counsel said, "And there's another person who was at the scene who doesn't remember anything, [Mrs.] Kilgore."  Following this, defense counsel asked whether Mrs. Kilgore, like Mr. Kilgore and the granddaughter, could have unbuckled her own seatbelt. Defense counsel then explained that an expert witness, Dr. Whitman McConnell, would explain that the soft tissue around Mrs. Kilgore's "hairline [neck bone] fracture" began to swell to the point where it impinged on

16

her spinal cord and that up to the point at which that impingement caused paralysis, Mrs. Kilgore was not paralyzed and could use her right arm to unbuckle the belt.

**{48}** In their motion in limine, Plaintiffs stated that Dr. McConnell, a medical doctor, was the only defense expert designated by Defendants who was possibly qualified to testify on the sufficiency of Mrs. Kilgore's functioning motor skills to unbuckle her seatbelt. Plaintiffs complained that Defendants had never "disclosed that [Dr.] McConnell [would] opine regarding [Mrs.] Kilgore's remaining motor skills." Plaintiffs also complained that Dr. McConnell's pretrial depositions were "silent on this subject." Plaintiffs therefore asked the district court to "preclude the defense from introducing any evidence that [Mrs.] Kilgore was capable of, or did unlatch her [seatbelt] at the conclusion of the rollover" and from making this argument to the jury. The district court denied Plaintiffs' motion in limine.

**{49}** Plaintiffs do not assert on appeal that the court erred in denying this motion in limine. Plaintiffs' point on appeal is that "[t]here was no competent evidence to support the surprise defense theory that [Mrs.] Kilgore unbuckled her own [seatbelt]," and they seek a new trial because of defense counsel's opening statement comments. They base this assertion on the alleged prejudicial effect of the statements. Plaintiffs complain that the facts defense counsel referred to in the opening statement could not be proved by Dr. McConnell or otherwise, and Plaintiffs assert that, because of the non-disclosure of Defendants' theory until opening statement, their ability to cure the prejudicial comments was significantly impaired. Citing to only a portion of two pages of a two-hour closing argument, Plaintiffs complain that this new theory became the centerpiece of Defendants' arguments to the jury.

**{50}** For the several reasons that follow, we do not see how Plaintiffs can complain. First and foremost, Dr. McConnell had testified, and his theory was neither new nor surprising. Second, Plaintiffs failed to object to defense counsel's opening statement comments. *See* Rule 12-216(A) NMRA. "To preserve an issue for review on appeal, it must appear that [the] appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court." *Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct. App. 1987); *see also State v. Varela*, 1999-NMSC-045, ¶ 25, 128 N.M. 454, 993 P.2d 1280 (stating that in order to preserve an issue for appeal, the defendant must make a timely objection that specifically apprises the district court of the nature of the claimed error and invokes an intelligent ruling thereon). The primary purposes for the preservation rule are: (1) to specifically alert the district court to a claim of error so that any mistake can be corrected at that time, (2) to allow the opposing party a fair opportunity to respond to the claim of error and to show why the district court should rule against that claim, and (3) to create a record sufficient to allow this Court to make an informed decision regarding the contested issue. *State v. Lopez*, 2008-NMCA-002, ¶ 8, 143 N.M. 274, 175 P.3d 942 (filed 2007); *Diversey Corp. v. Chem-Source Corp.*, 1998-NMCA-112, ¶ 38, 125 N.M. 748, 965 P.2d 332; *cf. State v. Boergadine*, 2005-NMCA-028, ¶ 31, 137 N.M. 92, 107 P.3d 532 (considering a prosecutor's opening statement comments for fundamental error because, due to lack of objection, the issue of prosecutorial misconduct was not preserved, and holding that even though the comments were "intentional and inappropriate, the statements are not

17

sufficiently 'egregious' to constitute fundamental error"); *State v. Neswood*, 2002-NMCA-081, ¶ 18, 132 N.M. 505, 51 P.3d 1159 (stating that, generally, the objection must be made at the time the evidence is offered). Generally, a motion for a new trial cannot be used to preserve issues not otherwise raised during the proceedings. *Goodloe*, 1999-NMCA-061, ¶ 13. Lastly, evidence given by Dr. McConnell was not fact, but opinion evidence, as Plaintiffs properly stated in their motion in limine.

{51}     Also significant, Plaintiffs took the opportunity to address the issue two days after opening statements with an expert of their own. Dr. Martha Bidez, an expert in biochemical engineering and injury causation, testified at some length about the manner in which Mrs. Kilgore was injured. Dr. Bidez testified that Mrs. Kilgore's neck fracture and paralysis could only have occurred after the seatbelt buckle released; that is, at the point of the neck fracture, Mrs. Kilgore was instantly paralyzed and could not have unbuckled her own seatbelt. Since Plaintiffs' counsel were aware of opposing counsel's opening statement theories and expectations of evidence to be presented to the jury, they were able to so inform their expert. As well, Dr. Bidez had read Dr. McConnell's pretrial depositions. She was therefore able to read his first deposition testimony that Mrs. Kilgore's "fracture occurred as a result of her head impacting the roof as the roof impacted the ground as she was restrained in the vehicle." Dr. McConnell also testified at deposition, based on witness Joe Russom's statements that Mrs. Kilgore "ha[d] some hand movement" and appeared to be suspended above the roof, and that "[a]t that point, an individual certainly could push the button to the restraint system and release it." Dr. Bidez nevertheless believed that Mr. Russom lacked credibility. Her opinion does not negate Dr. McConnell's testimony, it only disputes it, leaving the fact for the jury to decide.

{52}     While Plaintiffs complain that Dr. Bidez's testimony was not all they would have wanted to present to counter Defendants' surprise theory, Plaintiffs do not explain why, with Dr. McConnell's deposition testimony in hand, they did not have any other or additional expert available to testify in a manner similar to that of Dr. Bidez and in anticipation of the testimony of Mr. Russom. *Cf. Mayeux*, 2006-NMCA-028, ¶ 39 ("Here, [the p]laintiffs have alleged no prejudice besides their lack of preparation and ability to counter . . . [the expert's] testimony with that of another witness so late in the trial. . . . Nor have [the p]laintiffs shown us that they asked for more time to conduct another deposition or interview of [the expert]." (internal quotation marks omitted)).

{53}     Plaintiffs might reasonably have anticipated the theory suggested in opening statement, on the horizon. The joint pretrial order in this case listed as a contested issue of fact "[w]hether someone unbuckled [Mrs.] Kilgore's [seatbelt] after the car stopped[.]" Dr. McConnell's pertinent pretrial deposition testimony was as follows:

> Q.     All right. What I'd like you to do for me, Dr. McConnell, if you would, please, is tell me the opinions and conclusions that you've reached in connection with this case.

18

A.     This is a rollover in which [Mrs.] Kilgore . . . was seated in the left rear seat of a '98 Subaru Outback SUV-type vehicle. And at the end of the roll, she was found to have a fractured second cervical vertebra. My first opinion is that the fracture occurred as a result of her head impacting the roof as the roof impacted the ground as she was restrained in the vehicle.

She sustained a left parietal hematoma or bruise resulting in a compressive lateral bend to the right that compressed the right side of the C-2 vertebra, producing a crack from the base of the odontoid rightward into the right mass of the second vetebra. In other words, this was a right lateralized fracture. The end result of that was a neurological compromise that resulted in [Mrs.] Kilgore becoming a quadriplegic.

That is pretty much the sum total of my opinions. There are [sic] some supporting information that obviously supports that.

. . . .

Q.     Okay. Is it your opinion or have you reached any opinion about whether Mrs. Kilgore was still belted after the accident?

A.     I don't have a scientifically based opinion. I have a speculation, but it's dependent upon the—upon the testimony of the witnesses, of which you're well aware, the differences between those witnesses, and supposition about what happened.

Q.     Okay. Well, what you're going to give me, then, isn't an opinion that you hold with some reasonable degree of medical certainty or scientific certainty. Correct?

A.     That's correct.

Q.     It's just a supposition based on what you've read and what you kind of think might be the case. Right?

A.     That's correct.

Q.     All right. Well, with that proviso, why don't you go ahead and tell me what our speculation is.

A.     I think that she was probably hanging upside down in the restraint system as the vehicle came to rest and as the witnesses came on scene. Joe Russom and his testimony that says that she has some hand movement and she appears to be suspended above the roof. Her head seems

19

to be suspended above the roof. As Dr. Mettler comes on scene and he sees Mrs. Kilgore, his impression is that she's on the roof, and this is sometime in the same time frame that the apparently undiscovered individual approaches from the other side of the vehicle and goes in to help extricate her from inside the vehicle. At that point, an individual certainly could push the button to the restraint system and release it. And the rest of the findings would be consistent with the exception of [the granddaughter's] testimony, such as it is.

{54} Further testimony of Dr. McConnell related to swelling. Defendants suggest that this testimony indicated that swelling and its pressure on the spinal cord caused Mrs. Kilgore's spinal cord injury. The testimony was as follows.

> Q. Did you see evidence in your review of the films of the epidural hematoma between the skull base and C-2?

> A. There was, but it's really not very dramatic.

> Q. What caused that, in your opinion?

> A. Very likely that is an acute injury—acute injury-related finding, and that's the swelling that you get when you've got injured tissue. It's the body's response to an injury.

> Q. Where was the injury that it was responding to?

> A. The fracture at C-2. Possibly a ligamentous injury is in relationship to that.

> Q. . . . The diffusely narrowed spinal canal in the area of C-2, was that, in your opinion, caused by the accident, or is that simply a preexisting condition?

> A. I think there was more that went along with that, that they were talking about edema [swelling] with diffuse narrowing. And if indeed that was the case, the edema was most likely associated with the injury.

> Q. When they talk about narrowing of the canal, I mean, the canal is formed by the hole in the vertebral body. Correct?

> A. But it's lined with the dural lining and the lining of the cord, and both of those can swell when they're injured.

20

Q.      All right.  So the narrowing in the canal in the area of C-2 is most likely associated with her acute injury?

A.      I think so.

Defendants suggest that Plaintiffs should have asked follow-up questions relating to the timing of the swelling—questions, for example, such as "How soon after the crash did the swelling start?" or "How long after the swelling started did [Mrs.] Kilgore become paralyzed?"  Both parties argue what Plaintiffs might have done with Dr. McConnell's opinion.  The fact is simply that Plaintiffs did not pursue evidence of which they were aware and which they seem to regret now not pursuing.  We are not called upon to substitute hindsight regarding trial tactics.

**{55}**    We acknowledge, as Plaintiffs assert, that in *Chavez v. Chenoweth*, 89 N.M. 423, 427, 553 P.2d 703, 707 (Ct. App. 1976), this Court stated that it is improper for counsel to refer to facts in an opening statement which cannot be proved.  This statement in *Chavez* does not require a new trial in the present case.  The circumstances in *Chavez* were considerably different.  Furthermore, testimony about Mrs. Kilgore possibly releasing her own belt is not a fact.  It is an opinion.  Counsel stated that Dr. McConnell would explain that the soft tissue around Mrs. Kilgore's fracture began to swell to a point it impinged on her spinal cord and caused paralysis, leaving open, based on Mr. Russom's testimony and other evidence, the possibility that Mrs. Kilgore was not paralyzed and could use her right arm to unbuckle the seatbelt.  Dr. McConnell testified in that manner not only in his deposition taken during trial, but also during his trial testimony when he testified that he could not rule out that Mrs. Kilgore might have had motor function and might have unbuckled her seatbelt.  We cannot categorically say that counsel in his opening statement stated a fact that could not be proved in this case.  Dr. McConnell's opinion as to the injuries and their effect, or lack thereof, were a matter only of the weight the jury placed on them.

**{56}**    Taking another approach, Plaintiffs also contend on appeal that Dr. McConnell's "self-unbuckling" testimony was speculative and did not satisfy the reliability requirement under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), as adopted in *State v. Alberico*, 116 N.M. 156, 861 P.2d 192 (1993).  In the district court, Plaintiffs objected to Dr. McConnell's anticipated testimony only on the ground of non-disclosure, not on *Daubert* grounds.  Plaintiffs do not in their briefs otherwise indicate where they preserved this issue.  Plaintiffs' attempt in their reply brief to show preservation by citing to the fact that it was raised in post-verdict proceedings on their motion for a new trial is unavailing.  As we indicated earlier in this opinion, generally, the objection must be made at the time the evidence is offered, *Neswood*, 2002-NMCA-081, ¶ 18, and a motion for a new trial cannot be used to preserve issues not otherwise raised during the proceedings, *Goodloe*, 1999-NMCA-061, ¶ 13, more so when not raised in the brief in chief.  We decline to review Plaintiffs' *Daubert* argument.

**Admission of Testimony Relating to a Press-Ball Test**

**{57}**    We review the admission of evidence for abuse of discretion pursuant to the cases and rules discussed earlier in this opinion. *See Moreland*, 2008-NMSC-031, ¶ 9; *Coates*, 1999-NMSC-013, ¶ 36; *Behrmann*, 110 N.M. at 327, 795 P.2d at 1019; *Hourigan*, 2001-NMCA-085, ¶ 21.

**{58}**    Plaintiffs assert error in the district court's having permitted certain defense witness deposition testimony in regard to "press-ball test 33" to be read to the jury, along with the other deposition testimony of the expert that was being introduced in regard to Takata's buckle-test protocol. The offensive deposition testimony, as characterized by Plaintiffs, involved a "speculative two-kilogram force limitation" that was not in any written test protocol. Plaintiffs assert that the written test protocol did not specify how much force on the buckle button was required in order to release it and that adding the objectionable testimony to the written test protocol had the prejudicial effect of changing the testing result in which the buckle "demonstrably failed" into one in which the buckle passed the test.

**{59}**    The deposition testimony at issue was elicited during Plaintiffs' examination of the witness. When the deposition testimony was presented to the jury, Plaintiffs sought to edit out the testimony of the two kilogram force, primarily, if not solely, on the ground that it was "mere speculation." The court allowed the testimony to be read to the jury.

**{60}**    On appeal, Plaintiffs claim reversible error in admitting this testimony on the grounds that (1) the testimony was a critical piece of evidence for Defendants, because without it the AB buckle demonstrably failed Takata's own test requirements, and with the two-kilogram-force limit added to the test, Defendants intended to show that the buckle passed the test; and (2) the testimony was "incompetent, speculative and false" and should not have been allowed in order to demonstrate that the buckle was not defective because it passed the press-ball test when performed with no more than two kilograms of force to the ball. Thus, Plaintiffs contend that the district court committed prejudicial error by allowing a defense witness to go outside of Takata's written test protocol and to speculate that the buckle could meet a particular test that Takata used in determining the susceptibility of the buckle to accidental release.

**{61}**    The written test, known as "Test 33" and also apparently referred to as an "elbow test," involved the use of various diameter steel balls pushed against the AB buckle release button. Plaintiffs' approach at trial was to show that under Test 33 a thirty-millimeter-diameter ball was used with unmeasured force to test if the buckle would open, and once the buckle failed this test, the result would be that the buckle did not meet Takata's specifications. Important for Plaintiffs' arguments, the written protocol for Test 33 did not contain any specification or description of a quantitative maximum force to be applied when pushing on the release button with the thirty-millimeter-diameter ball. One or more of Plaintiffs' experts demonstrated that the AB buckle could be opened by pressing a thirty-millimeter ball against the buckle release button with a modest but unmeasured force akin to an elbow pressing on the buckle button.

22

**{62}**     Plaintiffs complain that Defendants had a Takata engineer make up two test conditions that were not in the protocol and were of trivial quantitative force that would not open or deform the buckle when Defendants recognized that the AB buckle failed Takata's written test protocol.

**{63}**     The testimony on the two-kilogram measurement at issue was essentially as follows:

> Q.     And is there any measurement of the load or is it just that the person can push the ball with whatever load he is comfortable with so long as it does not bend or deform the housing or other parts?
>
> . . . .
>
> THE WITNESS:     The person who opens doing this testing would be intentionally trying to cause the opening or separation. . . .
>
> Perhaps it is more likely that the separation or opening would occur. [The load is applied at the level that no deformation would be caused.]
>
> So perhaps it would be along the level of two kilograms or so, I would imagine.

Pressed further with the question whether he measured it, the witness answered, "I'm guessing, but it would be about two kilograms."  Thus, Plaintiffs contend that the two-kilogram testimony was speculative; whereas, Defendants contend that it was an estimation based on the witness's personal involvement in developing the AB buckle for Takata, that the load is such that you do not deform the outer housing of the buckle, and that the issue is not admissibility, but weight and credibility.

**{64}**     We are not persuaded that the district court committed reversible error.  "Our courts have repeatedly recognized that the trial court is in the best position to evaluate the effect of trial proceedings on the jury."  *Norwest Bank N.M., N.A.*, 1999-NMCA-070, ¶ 39; *see Romero v. State*, 112 N.M. 332, 334, 815 P.2d 628, 630 (1991) ("The trial court [is] in the best position to determine if, in the overall context of the case, evidence . . . was relevant."), *receded from on different grounds by Dunleavy v. Miller*, 116 N.M. 353, 862 P.2d 1212 (1993).

> For this reason, the trial court is vested with broad discretion to determine under Rule 11-403 whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.  We will not disturb the trial court's decision on appeal unless that discretion is abused.  We will find an abuse of discretion when the court's decision is without logic or reason, or that it is clearly unable to be defended.

23

*Norwest Bank N.M., N.A.*, 1999-NMCA-070, ¶ 39 (internal quotation marks and citations omitted). "[T]he complaining party on appeal must show the erroneous admission . . . of evidence was prejudicial in order to obtain a reversal." *Cumming v. Nielson's, Inc.*, 108 N.M. 198, 203-04, 769 P.2d 732, 737-38 (Ct. App. 1988). This burden includes having to show a "high probability that the improper evidence may have influenced the factfinder." *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*, 2005-NMCA-051, ¶ 32, 137 N.M. 524, 113 P.3d 347 (internal quotation marks and citation omitted). "The admission of expert testimony is within the sound discretion of the court and its decision will not be overturned unless an abuse of discretion is shown." *Leithead v. City of Santa Fe*, 1997-NMCA-041, ¶ 27, 123 N.M. 353, 940 P.2d 459.

**{65}**　We hold that the district court did not abuse its discretion in allowing the two-kilogram testimony to be read to the jury along with the remainder of the testimony that was elicited by Plaintiffs. The witness's credibility and the weight to be given to the testimony were for the jury.

**CONCLUSION**

**{66}**　The district court did not abuse its discretion in denying Plaintiffs' motion for a new trial based on claims of juror misconduct, of improper comments in opening statement, and of erroneous evidentiary rulings. We affirm the defense verdict.

**{67}　IT IS SO ORDERED.**

_____

**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____

**RODERICK T. KENNEDY, Judge**

_____

**LINDA M. VANZI, Judge**

Topic Index for *Kilgore vs. Fuji Heavy Industries, Ltd.*, No. 27470

**AE**　　　　　　**APPEAL AND ERROR**
AE-PA　　　　　　Preservation of Issues for Appeal

**AT**　　　　　　**ATTORNEYS**
AT-CT　　　　　　Comments by Attorneys at Trial

| **CP** | **CIVIL PROCEDURE** |
|---|---|
| CP-MN | Motion for New Trial |

| **EV** | **EVIDENCE** |
|---|---|
| EV-EW | Expert Witness |
| EV-SC | Scientific Evidence & Daubert Standard |

| **JR** | **JURIES** |
|---|---|
| JR-IC | Improper Juror Communication |
| JR-PJ | Propriety of Juror Conduct |

| **NG** | **NEGLIGENCE** |
|---|---|
| NG-NG | Negligence, General |
| NG-CW | Crashworthiness |

| **TR** | **TORTS** |
|---|---|
| TR-PR | Products Liability |