This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                              **No. A-1-CA-34862**

**RANDALL EUGENE COOK,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**Karen L. Townsend, District Judge**

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

Law Offices of Jennifer J. Wernersbach, P.C.
Jennifer J. Wernersbach
Albuquerque, NM

for Appellant

**MEMORANDUM OPINION**

**BOHNHOFF, Judge.**

{1}     Defendant Randall Eugene Cook appeals from his convictions following an

April 2015 jury trial of one count of criminal sexual contact of a minor (CSCM) in the second degree (person in position of authority), one count of CSCM in the third degree (person in position of authority), NMSA 1978, § 30-9-13(B)(2)(a), (C)(2)(a) (2004); and one count of contributing to the delinquency of a minor (CDM), NMSA 1978, § 30-6-3 (1990). Defendant makes four arguments: (1) the district court erred when it concluded that he was competent to stand trial, (2) the district court erred when it denied Defendant's motion for a mistrial following the admission of evidence in violation of Rule 11-403 NMRA, (3) the district court erred when it denied Defendant's motion for a directed verdict because the State presented insufficient evidence to prove beyond a reasonable doubt that he was in a position of authority over the victim and used that authority to coerce the victim, and (4) the district court erred in denying Defendant's motion for a new trial due to jury taint. We affirm on all issues.

**BACKGROUND**

**A.      Conduct for Which Defendant Was Charged**

{2}      The victim (A.M.) met Defendant through her closest friend, E.C., in early 2012. Defendant was dating E.C.'s mother at the time. During the spring of 2012, A.M. went to E.C.'s house one to three times a week, and sometimes spent one or two nights there, while Defendant was present. A.M.'s thirteenth birthday was in May

2012. Shortly after her birthday, Defendant drove A.M. to Navajo Lake. On their way to the lake they smoked hashish, a concentrated form of marijuana, and smoked more hashish when they arrived at the lake. A.M. testified that she was in and out of consciousness, and that while she was high, Defendant started rubbing her stomach under her shirt and touched her breast. A.M. believed Defendant touched her breast over her shirt, but because she was under the influence of the hashish at the time, she was not sure.

{3}     Later during the same month, A.M. spent the night at E.C.'s house, and while there, watched a movie with Defendant and E.C. A.M. testified that Defendant asked her to sit on a recliner where he and E.C. were sitting and that she did so. A.M. testified that while she was sitting under a blanket next to Defendant, he started to rub her stomach and gradually moved his hand under her shirt. A.M. pushed his hand away, but Defendant later put his hand under her bra and grabbed her nipple with his fingers. A.M. got up, went to E.C.'s room, and laid down on the bed and cried. E.C. followed, and A.M. told her what happened. While E.C. and A.M. were both on E.C.'s bed and A.M. was crying, Defendant came in, laid down between them, and apologized to A.M. for offending her, while at the same time moving his hand under her shirt on her stomach. E.C. then asked Defendant to leave her room.

**B.     Prosecution of Defendant for Sexual Abuse of E.C.**

{4}     As a result of the same underlying investigation that resulted in the CSCM charges involving A.M., the State charged Defendant with multiple counts of CSCM in the second degree and multiple counts of criminal sexual penetration in the first degree, all involving E.C. That case was the subject of a jury trial in 2014 at which E.C., among other witnesses, testified. Defendant was acquitted of all charges in that case.

**C.      Competency Hearing**

{5}     Dr. Alexander Paret, a clinical and forensic psychologist, evaluated Defendant to determine his competency. Dr. Paret found that Defendant showed "clinically significant impairment" with respect to understanding his legal situation and his ability to consult with his attorney. Dr. Paret also found that Defendant's "delusional beliefs and hallucinations . . . may result in a misinterpretation of events, thus further impacting his rational understanding of his legal situation." Dr. Paret ultimately concluded that Defendant was not competent to stand trial.

{6}     Dr. Paret was the sole witness to testify during the competency hearing in October 2013. However, the State played a recording of one telephone call Defendant made to a third party on April 26, 2013, while he was incarcerated at the San Juan County Detention Center in Farmington, New Mexico. During the call, Defendant recounted his earlier conversation with an attorney who no longer represented him at

4

the time of the telephone call. According to Defendant, during his conversation with the other attorney, he discussed in detail litigation strategy for this case, including information Defendant had regarding specific items in evidence and what could be done to suppress evidence so that charges would be dismissed.

{7}     The district court ultimately found that Defendant was competent to stand trial. The district court stated:

> I think that the telephone recording was telling in . . . Defendant's analysis of how . . . the prosecution and the court would respond in regards to issues concerning evidence, that he had a—not only a rational appreciation but a factual understanding of the competency side of the criminal matter, as [the State] indicated. Quite bluntly, I can't believe that Dr. Paret held with his opinion after listening to that recording. Regardless, it is my finding based on the evidence that . . . Defendant is competent to stand trial.

**D.     E.C.'s Trial Testimony**

{8}     The trial took place on April 15, 2015. The State called E.C. to testify as part of its case in chief. During E.C.'s direct examination, the following exchange took place:

| State: | Would you do anything that others might consider inappropriate with [Defendant]? |
| --- | --- |
| Defense: | Objection, Your Honor. Leading. |
| Judge: | Overruled. |
| E.C.: | Yes, sir. |

5

State: What would that be?

E.C.: Um, inappropriate things happened, I guess, between us you would say. I don't know quite what you're asking, sir.

At this point, defense counsel objected and the district court held a bench conference that was off the record. Afterwards, the prosecutor resumed his direct examination of E.C.:

State: Let me rephrase that—that previous question. Did you ever do anything with [A.M.] and [Defendant] that others may consider inappropriate?

E.C.: Yes, sir.

State: What was that?

E.C.: Me and [A.M.] smoked marijuana with him for the first time.

E.C. then testified that she and A.M. smoked marijuana "quite often" with Defendant using marijuana that he provided. Defense counsel did not object to the prosecutor's "rephrased" question or to the testimony that followed about E.C. and A.M. smoking marijuana with Defendant.

**E.    Post-Verdict Proceedings**

**1.    Defendant's Motion for New Trial**

{9}    After the jury delivered its verdict, State and Defendant's counsel spoke with the jury foreperson. Based on that conversation, Defendant's counsel filed a motion

6

on April 30, 2015 to set aside his convictions and for a new trial. Defendant's motion states: "During that conversation, the foreperson indicated there was belief that there may be a case involving a minor witness. . . . The foreperson elaborated that the jury believed this cause number was a lesser case and that . . . Defendant may be involved in another case with similar charges."

**{10}** In its response to the motion, the State did not dispute defense counsel's characterization of the conversation with the foreperson, but argued "[t]here [is] no evidence or indication that the previous [t]rial for Defendant tainted the jury. During jury selection there was no indication from the panel and ultimately the selected jurors that they had any knowledge of the previous trial. This case did not receive any significant media attention and does not warrant being retried."[1] The State added: "The State does not recall the specific sequence of the conversation with the foreperson but does recall informing the foreperson that this was not . . . Defendant's only case. Counsel . . . does not recall if this prompted the foreperson's statements or if her statements came first."

**2.      Defendant's Sentencing Hearing**

**{11}** At the beginning of Defendant's June 1, 2015 sentencing hearing, the parties

---

[1]Defense counsel did not dispute the State's representation that during voir dire the panel members were asked whether they had any previous knowledge or information about Defendant, which would encompass his earlier trial for the charges of sexual abuse against E.C.

argued Defendant's motion for a new trial. The district court initially asked defense counsel, "Is there any evidence, or do you have any information, to tend to show that any of the jurors had extrinsic evidence outside of what they may have learned in the courtroom or in the jury room?" Defense counsel indicated that he "only had the one conversation" and that he prepared the motion to set aside the verdict because he did not think that he could question the jurors outside the presence of the court.

{12}    The district court then asked defense counsel whether there was uncertainty that the allegedly prejudicial information "was something the juror learned in the courtroom that may have been prejudicial to their decision[.]" Defense counsel responded "Yes." The district court again asked defense counsel, "So at this point you do not know if there was any extraneous prejudicial information outside the courtroom?" Defense counsel responded, "That is correct; I do not know."

{13}    During argument on the motion, the prosecutor reminded the district court that, during voir dire, the panel members were asked whether any of them knew Defendant, and no one answered in the affirmative. The State also stated: "I do vaguely recall the conversation that we had [with the foreperson]. I don't know if [the foreperson's] statements were made—I disclosed that [Defendant] had another case at some point during the conversation and I don't recall if it was before she had made a statement or if her statements were elicited from—as a response to what I'd said." {14}    O      n

rebuttal, defense counsel repeated the request for an evidentiary hearing that would take testimony from the foreperson and possibly other jurors. Defense counsel then stated,

> [The State] brings up an interesting point that if [the jurors] could have used their smart phone. I know that . . . the jurors are all advised not to do anything like that. However, in this case, because there [were] comments made during the trial that alluded to or *potentially* alluded to something else that if they had a time during a break or during lunch if that was anything that came up. We don't know that because we weren't in the jury room with them to decide that, but I believe that empaneling the jury again to ask those questions *might* prove to be worthwhile.

**{15}** The district court denied the motion based on Rule 11-606(B) NMRA stating, "Asking those questions of the jury is improper unless there is some extraneous prejudicial information, and that's something that I simply have not heard. I just have a lot of theories and assumptions without a lot of facts to go with it."

**3. Defendant's Appellate Brief in Chief**

**{16}** On appeal, the conversation with the foreperson is described in different and more vague terms than that given in Defendant's motion for new trial. That is, appellate counsel writes, on the basis of what is described as communications with Defendant's trial counsel, that the foreperson stated that the jury knew during its deliberations that Defendant was involved in "something bigger than this."

**DISCUSSION**

**A. The District Court Did Not Abuse Its Discretion in Finding Defendant**

**Competent to Stand Trial**

{17} "A person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *State v. Rael*, 2008-NMCA-067, ¶ 6, 144 N.M. 170, 184 P.3d 1064 (alteration, internal quotation marks, and citation omitted); *see also State v. Rotherham*, 1996-NMSC-048, ¶ 13, 122 N.M. 246, 923 P.2d 1131 ("The law has long recognized that it is a violation of due process to prosecute a defendant who is incompetent to stand trial."). "A defendant is presumed competent to stand trial and bears the burden of demonstrating incompetence by a preponderance of the evidence." *Rael*, 2008-NMCA-067, ¶ 6. "Preponderance of the evidence simply means the greater weight of the evidence[.]" *Campbell v. Campbell*, 1957-NMSC-001, ¶ 24, 62 N.M. 330, 310 P.2d 266. A defendant is competent to stand trial when he has the ability "to consult with his lawyer with a reasonable degree of rational understanding" and "has a rational as well as factual understanding of the proceedings against him." *Rotherham*, 1996-NMSC-048, ¶ 13 (internal quotation marks and citation omitted). A defendant "must have the capacity to assist in his own defense and to comprehend the reasons for punishment." *Id.*

{18} "On appeal, we review the district court's determination only for an abuse of

10

discretion, viewing the evidence in the light most favorable to the [court's] decision." *Rael*, 2008-NMCA-067, ¶ 6 (internal quotation marks and citation omitted). "A district court abuses its discretion when its ruling is clearly against the logic and effect of the facts and circumstances of the case." *Id.* (internal quotation marks and citation omitted).

{19}     During Defendant's telephone call with the third party about the conversation he had with the attorney who no longer represented him, Defendant recounted the following:

> He goes, 'It's actually a blessing for you.' I said, 'How do you figure?' He goes, 'Well, if you wait until after the judge goes ahead and dismisses all of the charges except for the two that allegedly took place, that uh, the earlier incident,' I said, 'The one with the car wreck?' He goes, 'Yeah.' He goes, 'If he dismisses all of them but those two,' he says, 'what he doesn't realize is he's dismissing the evidence on the ones that he—he is dismissing the evidence [inaudible] the exhibit because (a) the search and seizure was done on that house, it wasn't done on the original house, and (b) when did it—when was that blanket bought?' And I said, 'Two years ago for Christmas,' and he said, 'Can you prove that?' I said, 'Yeah, I can prove that, I bought it at Walgreens and I bought it for her for Christmas,' and he goes, 'How can something that was bought two years ago be at a crime scene four years ago?' [Defendant laughs]

{20}     Defendant continued on the same call:

> 'Seriously, put yourself in the jury box, right? You're the juror,' and I'm like yeah, and he goes, 'Well, somebody comes up to you—comes up—and says . . . when did you buy that part, when did you get that blanket, two years ago, the jury is going to say how the hell is that possible, this must have happened four years ago. See what I mean?' And he says . . . 'then, and all the pictures, all of the evidence and things

11

that they say they may have from that house, well number one the picture of her bed would have to be there,' and I say, 'Well, that wasn't her bed four years ago, that was her bed and another girl's.' And he goes, 'Exactly, it's not the same set up, it's not the same house, it's not the same bed, that was your bed, what was her bed?' I said, 'It was a play bed,' well then where's her bed, well it's at the county landfill right now. He goes, 'You see what I'm getting at?' I went, 'Oh yeah, I totally see.' He said, 'So let it come back, let them do whatever they want to do.'

{21} Defendant continued, discussing the process of determining competency and dangerousness, as well as the impact of that process on his case.

Skull fractures that I sustained when I was a child and then the [inaudible] he cut the bottom of my foot, it took fourty-eight stitches to mend back together, I still carry the scar, shit like that. According to them, that would make it—that would make it—it would not make it possible for me to stand trial. That means that they could not—I can't go to a jury trial, that means that the judge would have to dismiss the charges, send my casework over to another judge, a mental health judge, that would have me evaluated to see if I'm a danger to society and look at my charges and see—and have another panel of psychologists interview me for like four or five hours and see if I'm a danger to society. If I am, then I have to go to Santa Fe for ninety days for an evaluation. If Santa Fe thinks that I'm a danger to society, they keep me in a mental institute. If Santa Fe thinks I'm not, they release me and I go home. So it could take up to six more months.

{22} Defendant continued to discuss the competency determination process as it related to his legal situation.

Can you believe that? They think I'm crazy. Which is okay to me too, because that means they can't charge me with anything. They can charge me all they want, but they can't convict me. See what I mean? If you're not competent to stand trial, therefore they can't convict you, they have to turn you over to mental health. And me being in a mental institute before, for a brief time, falls in those guidelines. I'm like, 'really . . .' So

12

at least they have no choice but to get me psychologically evaluated. Do *you* think I'm crazy? [Defendant laughs]

{23} In recounting the specific details of his conversation with the attorney, Defendant clearly remembered the conversation and was able to understand the possible outcomes of the competency process. Defendant further understood that there was a dangerousness determination following the district court's determination of competency. Defendant could also recall details of incidents that he believed would assist his case. For example, Defendant explained that he could prove he had purchased a blanket that he believed the prosecution would offer as a key piece of evidence on a date that was later than the date of the crime. Defendant also discussed the impact of the court granting his motion to suppress evidence that was found when a warrant was executed on a home where the crime did not occur.

{24} We note, in particular, that during the telephone call Defendant displayed a relatively accurate understanding of the impact of the competency determination process on his case: "They think I'm crazy. Which is okay to me too, because that means they can't charge me with anything. They can charge me all they want, but they can't convict me. . . . If you're not competent to stand trial, therefore they can't convict you, they have to turn you over to mental health."

{25} The district court was not obligated to accept Dr. Paret's opinion, even if the

State did not present an expert to rebut his opinion. *See State v. Jason F.*, 1998-NMSC-010, ¶ 29, 125 N.M. 111, 957 P.2d 1145 (noting that the district court had discretion to reject expert testimony regarding defendant's competency in light of other evidence). *See generally State v. Lovato*, 1991-NMCA-083, ¶ 21, 112 N.M. 517, 817 P.2d 251 ("A trial court is not required to accept uncontradicted testimony as true" if it is called into question by other facts and circumstances of the case.). Further, we do not reweigh the evidence, and we view the evidence in the light most favorable to the district court's decision. *See State v. Johnson*, 1983-NMSC-043, ¶ 7, 99 N.M. 682, 662 P.2d 1349 ("Conflicts in evidence are to be resolved by the trier of facts[.]"); *Rael*, 2008-NMCA-067, ¶ 6. The jail call can be understood to indicate that Defendant had, to a reasonable degree, a factual and rational understanding of the charges he faced, as well as the legal proceedings against him, and that he had the ability to assist his attorney. *See Rotherham*, 1996-NMSC-048, ¶ 13. The district court's ruling that Defendant was competent was not clearly against the logic and effect of the facts and circumstances in this case. Viewing the evidence in the light most favorable to the court's decision, we conclude that the district court did not abuse its discretion.

**B.      The District Court Did Not Abuse Its Discretion in Admitting Testimony From E.C. and Ruling That Testimony Did Not Violate Rule 11-403**

{26}      Defendant contends that E.C.'s "inappropriate things happened" testimony was

14

a reference to, or at least understood by the jury as a reference to, his alleged sexual abuse of E.C. which was the subject of his separate criminal trial in 2014. According to Defendant, "[t]hese 'inappropriate things' were presumably a reference to conduct for which [Defendant] had already been tried and acquitted, and the jury did not miss this inference." He argues that the testimony was improper evidence of his character and propensity to commit crimes, contrary to Rule 11-403 and, by implication, Rule 11-404(B)(1) NMRA, and that the district court should have either excluded the evidence or granted a mistrial.

{27}    Rule 11-403 states, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Rule 11-404(B)(1) states, "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." "Other-act evidence that proves only character or propensity is unfairly prejudicial and properly excluded under Rule 11-403." *State v. Sena*, 2008-NMSC-053, ¶ 16, 144 N.M. 821, 192 P.3d 1198. However, when the other-act evidence is offered for a legitimate, non-character purpose, "its admissibility under Rule 11-403 depends on the balance of its probative value against any prejudicial

effect that it may have had." *Id.* "Determining whether the prejudicial impact of evidence outweighs its probative value is left to the discretion of the trial court." *State v. Rojo*, 1999-NMSC-001, ¶ 48, 126 N.M. 438, 971 P.2d 829 (alteration, internal quotation marks, and citation omitted). We "review such determinations for abuse of discretion and give much leeway to trial judges who must fairly weigh probative value against probable dangers." *Sena*, 2008-NMSC-053, ¶ 16 (internal quotation marks and citation omitted).

{28}     We disagree that E.C.'s "inappropriate things happened" testimony necessarily, or even likely, was a reference to the sexual abuse charges for which Defendant was tried and acquitted in 2014. Nothing in E.C.'s testimony makes any reference to those allegations. On the contrary, the testimony that immediately followed related to the multiple times that Defendant had smoked marijuana with E.C. and A.M. Moreover, the testimony about smoking marijuana was admissible to prove facts other than Defendant's character, because it was relevant not only to the coercion element of the CSCM charges but also to the CDM charge. We therefore give leeway to the district court in this case, *see State v. Otto*, 2007-NMSC-012, ¶ 14, 141 N.M. 443, 157 P.3d 8, and conclude that the court did not abuse its discretion in admitting E.C.'s testimony that "inappropriate things happened" without a curative instruction.

{29}     Defendant also argues that the district court erred in not granting his motion for

16

a mistrial, which Defendant's trial counsel avers occurred during the bench conference that was off the record. "Since the granting of a mistrial is discretionary with the trial court, [appellate courts] will not disturb the decision on appeal absent an abuse of discretion." *State v. Sutphin*, 1988-NMSC-031, ¶ 18, 107 N.M. 126, 753 P.2d 1314. "Moreover, the power to declare a mistrial should be exercised with the greatest caution." *Id.* "The trial judge is in a much better position to know whether a miscarriage of justice has taken place and his opinion is entitled to great weight in the absence of a clearly erroneous decision." *Id.* (internal quotation marks and citation omitted). "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *Id.* For the same reasons that the district court did not abuse its discretion in not excluding E.C.'s "inappropriate things happened" testimony, it also did not abuse its discretion in denying the mistrial request.[2]

**C.  The State Presented Sufficient Evidence That Defendant Was in a Position of Authority Over A.M. and That Defendant Used That Authority to Coerce A.M.**

{30}    As set forth in the jury instructions, to which Defendant did not object and on

---

[2]The record reflects that defense counsel objected to E.C.'s testimony only on grounds that the State's question was leading, and that Rules 11-403 and 11-404(B) were not invoked. Because it was not recorded, we do not know whether these additional grounds for objection were raised during the bench conference. However, because Defendant's argument fails on its merits, we need not address whether the error, even assuming there was one, was preserved.

17

which he does not raise an issue on appeal, the State was required to prove the following elements of CSCM in the second degree beyond a reasonable doubt: (1) "The defendant touched or applied force to the unclothed breast of [A. M.]"; (2) "The defendant was a person who by reason of the defendant's relationship to [A.M.] was able to exercise undue influence over [A.M.] AND used this authority to coerce [A.M.] to submit to sexual contact"; (3) "[A.M.] was at least [thirteen] but less than [eighteen] years old"; and (4) "This happened in New Mexico on or about or between May 03, 2012 to May 31, 2012." *See* UJI 14-926 NMRA; *see also State v. Smith*, 1986-NMCA-089, ¶ 7, 104 N.M. 729, 726 P.2d 883 ("Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured."). The jury instruction for CSCM in the third degree was the same as the second degree jury instruction except that it omitted the word *unclothed*. *Compare* § 30-9-13(B), *with* § 30-9-13(C). Defendant argues that the State did not present sufficient evidence to prove beyond a reasonable doubt that Defendant was in a position of authority over A.M. and that Defendant used that position of authority to coerce A.M. We disagree.

**{31}**    "We review the evidence introduced at trial to determine whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Gipson*, 2009-NMCA-053, ¶ 4, 146 N.M. 202, 207 P.3d 1179 (internal

18

quotation marks and citation omitted).

> We view the evidence in the light most favorable to the verdict, resolving all conflicts and indulging all inferences in favor of the verdict. We do not reweigh the evidence or substitute our judgment for that of the fact finder as long as there is sufficient evidence to support the verdict. Furthermore, the jury is free to reject [the d]efendant's version of the facts. Finally, we note that this Court cannot consider the merit of evidence that may have supported a different result.

*Id.* (citations omitted).

**1.     Position of Authority**

{32}     NMSA 1978, Section 30-9-10(E) (2005) defines "position of authority" as a "position occupied by a parent, relative, household member, teacher, employer or other person who, by reason of that position, is able to exercise undue influence over a child[.]" We conclude that the State presented substantial evidence to establish beyond a reasonable doubt that Defendant occupied a position of authority over A.M. and, by reason of that position, was able to exercise undue influence over her. *See Sutphin*, 1988-NMSC-031, ¶ 21 ("Where . . . a jury verdict in a criminal case is supported by substantial evidence, the verdict will not be disturbed on appeal.").

{33}     First, there was substantial evidence that Defendant was a father figure to A.M. A.M. testified that she was "very close" to Defendant and thought of him as a "father figure." A.M. testified that Defendant told A.M. that he considered himself to be a father to her. A.M. testified: "He was my dad. I would have done pretty much

19

anything for him." A.M.'s mother testified as well that Defendant told her that, because her husband had died, he would be a father figure to A.M. and that A.M. was a "sweetheart" to him. A.M.'s mother also testified that Defendant told her that A.M. "was like a daughter to him" and that he would "watch" and "take care of" A.M. A.M.'s mother trusted Defendant. Perhaps most compelling, Defendant himself testified that he "absolutely" considered A.M. to be like a daughter to him, and that he told other people A.M. was like a daughter to him.

{34} Second, there was substantial evidence that Defendant, by reason of his father-figure status, was in a position to exercise undue influence over A.M. A.M. stated she was "very happy" that Defendant was a father figure to her and that she trusted Defendant "with all [her] heart." Similarly, as stated above, A.M. testified that she "would have done pretty much anything for [Defendant]." A.M. testified that she spent "a lot of time" at E.C.'s house, where Defendant also lived, was at E.C.'s house one to three times a week, and that she spent the night at E.C.'s house on more than one occasion.

{35} In *Gipson*, which was factually similar to this case, this Court determined that "the jury could reasonably conclude that [the d]efendant was in a position of authority over [the victim] in many different ways." 2009-NMCA-053, ¶ 24. The defendant "was considered by [the victim] to be a father figure, he acted as a father figure when

20

other people were around, and he was entrusted by [the victim's] mother to act as her guardian at times." *Id.* Similarly, A.M. considered Defendant to be a father figure, and A.M.'s mother trusted Defendant, who had told her that he would watch and take care of A.M.

{36}     In *Gipson*,

> [the d]efendant's position as mother's trusted friend allowed him the opportunity to be alone with [the victim] when she spent the night at his house and when she went to the trash dump in his truck. These opportunities allowed him to commit the sexual offenses when no one else was present and enhanced the chance that [the victim] would feel powerless to prevent the contact.

*Id.* ¶ 24. Similarly, A.M. also spent the night at E.C.'s house and went to her house one to three times per week. Defendant plied A.M. and E.C. with marijuana and smoked it with them. At trial, A.M. testified that she, E.C., and Defendant would "smoke pot," "watch movies," "go camping, [and] go to the log cabin out in Colorado."

{37}     A.M. was alone with Defendant during the incident at Navajo Lake, and A.M. and E.C. were alone with Defendant watching a movie when the other incident occurred during the same month. Defendant clearly had both access to and control over A.M. as a result of his position of authority that allowed him the opportunity to touch her breast twice.

**2.     Coercion**

21

{38}     We also conclude that the State presented substantial evidence to establish beyond a reasonable doubt that Defendant used his position of authority to coerce A.M. to submit to sexual contact. *See Sutphin*, 1988-NMSC-031, ¶ 21.

{39}     "Coercion for the purposes of CSCM occurs when a defendant occupies 'a position which enables that person to exercise undue influence over the victim and that influence must be the means of compelling submission to the contact. Such coercion might take many forms but is less overtly threatening than physical force or threats.' " *State v. Gardner*, 2003-NMCA-107, ¶ 22, 134 N.M. 294, 76 P.3d 47 (alterations omitted) (quoting UJI 14-926, comm. cmt.). "Undue influence results from moral, social, or domestic force exerted upon a party, *so as to control the free action of his or her will.*" *Id.* (emphasis added) (alteration, internal quotation marks, and citation omitted). "Submission to the request of an authority figure is coerced if it is achieved through undue influence[.]" *State v. Gillette*, 1985-NMCA-037, ¶ 30, 102 N.M. 695, 699 P.2d 626.

{40}     Defendant clearly occupied an authority position that enabled him to exert undue influence over A.M., which was the means of compelling A.M.'s submission to the sexual contact. Defendant argues that the State did not present any evidence that Defendant "had to convince [A.M.] to spend time with him or cultivate a friendship with him[.]" Defendant's characterization of what constitutes coercion reflects a

misunderstanding of the applicable law defining coercion.

{41} In *Gardner*, the victims were students at a school where the defendant was the assistant principal. 2003-NMCA-107, ¶ 2. One of the victims had gone to speak with the defendant about a school problem when the criminal sexual contact occurred. *Id.* ¶ 34. Another victim was standing on a chair working on a bulletin board at the school when the criminal sexual contact occurred. *Id.* ¶ 35. The defendant argued

> that he did not coerce the contact because he never approached the victims or directed them to do anything. While he acknowledges that the evidence supported the inference that he inappropriately touched the students when circumstances permitting it arose, he argues that the evidence does not support the necessary element of use of authority to coerce.

*Id.* ¶ 21 (internal quotation marks omitted). The *Gardner* court rejected that argument, holding that:

> This evidence supports the inference that [the d]efendant used his position of authority to gain the trust of the victims, to obtain the opportunity to touch the victims, and to cause them to submit to his unlawful touching. . . . The testimony permitted the jury to reasonably infer a connection between [the d]efendant's position of authority and his sexual contact with the victims, which is sufficient to infer the existence of coercion.

*Id.* ¶ 38.

{42} *Gillette*, *Gardner*, and *Gipson* indicate that coercion is established when the defendant's position of authority enables him or her not only to be in sufficiently close physical proximity to sexually abuse the victim, but also to control the victim's will

23

to the point where the latter will submit to the abuse. Defendant used his position of authority to gain A.M.'s trust, to obtain the opportunity to touch her, and to cause her to submit to his unlawful touching. Defendant's use of hashish while at Navajo Lake to dull A.M.'s senses is perhaps a more extreme means of controlling her will, but the subsequent incident, while watching a movie at E.C.'s house, is equally reflective of how Defendant physically, mentally, and emotionally positioned himself to exert his will over A.M. In both instances, the jury reasonably could infer a connection between Defendant's position of authority and his sexual contact with A.M., which is sufficient to conclude that Defendant coerced A.M. to submit to the sexual contact. *See Gardner*, 2003-NMCA-107, ¶ 38.

**D. The District Court Did Not Abuse Its Discretion by Denying Defendant's Motion for a New Trial; Defendant Did Not Make the Required Preliminary Showing That Extraneous Prejudicial Information Actually Reached the Jury**

{43} Defendant argues that the district court erred in not granting a new trial based on the jury foreperson's post-trial statement that the jury knew that Defendant was involved in "something bigger than this."

{44} The parties analyze the issue under *State v. Ramirez*, 1968-NMSC-148, 79 N.M. 475, 444 P.2d 986. In *Ramirez*, the defendant submitted, post-trial, an affidavit of a witness regarding events that allegedly occurred on the day of the murder at issue, specifically, that the defendant was not one of the two men that she saw immediately

before she entered the store where the murder had just occurred. *Id.* ¶ 9. This was newly discovered evidence, because the witness' testimony concerning what she saw on the day of the murder was unknown to the parties—or the jury—until after the trial occurred. *See id.* In this case, the foreperson's statement following the verdict concerned evidence of which the jury purportedly *was* aware prior to reaching its verdict. The analysis set forth in *Ramirez* regarding whether newly discovered evidence requires a new trial thus does not apply here. Instead, this appeal presents the question of whether the foreperson's statement following the verdict signaled that the jury had received extraneous prejudicial information before it reached its verdict. This issue is analyzed in detail in *State v. Mann*, 2002-NMSC-001, 131 N.M. 459, 39 P.3d 124.

{45}    Our Supreme Court stated in *Mann* that it "will not overturn a trial court's denial of a motion for a new trial unless the trial court abused its discretion" because "the ruling is arbitrary, capricious or beyond reason." *Id.* ¶ 17 (internal quotation marks and citation omitted). *Mann* determined that "[t]he Court of Appeals correctly emphasized that reliance upon this standard reflects not only the important policies implicated by motions for new trial, but also the trial court's unique position in passing upon such questions in the first instance" and concluded that "the trial court is in the best position to make this judgment." *Id.* (alteration, internal quotation marks,

and citation omitted).

**1.** ***Mann* Requires a Preliminary, Affirmative Showing That Extraneous Information Actually Reached the Jury and Came to Bear on the Jury's Deliberations**

{46}     "The party requesting a new trial on the basis that the jury was exposed to extraneous information must make a preliminary showing that he or she has competent evidence that material extraneous to the trial actually reached the jury." *Id.* ¶ 19 (alteration, internal quotation marks, and citation omitted). "Thus, [the d]efendant has the burden to show that the extraneous information actually reached the jury. This burden is not discharged merely by allegation; rather, [the d]efendant must make an affirmative showing that some extraneous influence came to bear on the jury's deliberations." *Id.* (internal quotation marks and citation omitted).

{47}     In *Kilgore v. Fuji Heavy Industries Ltd.*, 2009-NMCA-078, 146 N.M. 698, 213 P.3d 1127, this Court applied *Mann* in the civil context and articulated the procedure to be followed by the district court when a party argues that it is entitled to a new trial because extraneous information reached the jury.

> In determining whether a new trial is required based on the juror's receipt of extraneous information, we look at whether the information that was imparted to the single juror gave rise to a presumption of prejudice requiring [the prevailing party] to rebut the presumption or at least requiring the district court to hold an evidentiary hearing and to question one or more jurors.

*Kilgore*, 2009-NMCA-078, ¶ 14. Because "the burden is on the movant to obtain a

26

new trial," the movant

> must make a preliminary showing that movant has competent evidence that material extraneous to the trial *actually reached* the jury. If the party makes such a showing, and if there is a reasonable possibility the material prejudiced the defendant, the trial court should grant a new trial. The trial court has a duty to inquire into the possibility of prejudice. In an *appropriate* case, the trial court should conduct an evidentiary hearing.

*Id.* ¶ 16 (emphases added) (internal quotation marks and citation omitted); *see also* Rule 11-606(B)(2)(a) NMRA (barring in general juror testimony about jury's deliberations; allowing, as an exception, testimony "about whether . . . extraneous prejudicial information was improperly brought to the jury's attention"); *Mann*, 2002-NMSC-001, ¶ 19 ("[The d]efendant must make an affirmative showing that some extraneous influence came to bear on the jury's deliberations." (internal quotation marks and citation omitted)). Thus, the district court is not required to hold an evidentiary hearing or to question jurors unless there has been some showing that a juror or jurors actually received extraneous information.

{48} In *Kilgore*, the plaintiff alleged that she suffered serious injuries in a vehicle rollover accident as a result of a defective seatbelt buckle that opened during the rollover. 2009-NMCA-078, ¶¶ 5-6. After the trial was over, the plaintiff moved for a new trial based on the affidavit of the owner of an auto repair shop, who testified that he had spoken with one of the jurors during the trial and told her that he had never

heard of a seat belt failure with the vehicle in question. *Id.* ¶¶ 9-10. On appeal from the district court's denial of the motion, this Court engaged in a lengthy analysis of whether the affidavit satisfied the threshold showing required by *Mann*, but ultimately concluded that it did not: "[W]e think the evidence in the present case falls short of the required preliminary showing. . . . [W]e doubt that there was a reasonable likelihood that the [repair shop] owner's statement had a significant effect on the juror's vote in the present case. Nor is there any reason to believe that the owner's statement reached another member of the jury." *Kilgore*, 2009-NMCA-078, ¶¶ 24, 30.

**2.      Defendant Did Not Make the Necessary Preliminary Showing**

{49}      The district court was presented with little more than speculation about the foreperson's statement to counsel. First, defense counsel acknowledged that he had no evidence that the jury actually received any extrinsic evidence and that he did not know whether the foreperson's comment was based on what the jury heard during the trial. Second, defense counsel engaged in pure speculation that, in response to E.C.'s vague comment that "inappropriate things happened," the jurors may have used their mobile phones to search the internet for information about Defendant. Third, defense counsel also did not dispute the prosecutor's comment that it was possible that the foreperson made her comment that the jury knew Defendant was involved in "something bigger than this" after the prosecutor disclosed that Defendant had another

criminal case. Thus, it is simply unknown whether the foreperson's "something bigger than this" comment referred to Defendant's alleged sexual abuse of E.C., E.C.'s trial testimony about smoking marijuana with Defendant, or something else. Defendant failed to make a preliminary showing—with competent evidence—that extraneous information actually reached the jury.

{50}     Defendant argues that, due to the district court's refusal to order questioning of the jurors, there was no ability for Defendant to make a sufficient preliminary showing that the jurors knew about extraneous prejudicial information. We disagree. Under *Mann* and *Kilgore*, the preliminary showing that extraneous information actually reached the jury must be made *before* the district court may order questioning of one or more of the members of the jury. Defense counsel ultimately did not make such a predicate showing to the district court. He apparently did not inquire further during his conversation with the foreperson to obtain more detail about the jury's knowledge of the other prosecution of Defendant, something he was not prohibited from doing. He also did not provide the district court with an affidavit that recounted, as accurately as possible, exactly what the foreperson had said. Further, and most significant to a determination of whether the district court abused its discretion, in the new trial motion defense counsel indicated that the foreperson had mentioned that the jury had some specific information about another prosecution of Defendant involving similar

charges. If true, this would be information that clearly was not disclosed during the trial and which would be prejudicial. Yet, at the subsequent hearing, defense counsel effectively retreated from that claim and instead told the district court that he did not know if the jury received "any extraneous prejudicial information outside of the courtroom."[3] In view of this failure to provide affidavits or other evidence, as well as uncertain and conflicting statements of counsel about exactly what the foreperson said, we cannot say that the district court abused its discretion in declining to authorize questioning of any jurors and instead denying the motion for new trial. *See Kilgore*, 2009-NMCA-078, ¶ 32 ("We . . . hold that the court was not required to conduct an evidentiary hearing or to otherwise investigate further when [the p]laintiffs failed to make the required preliminary showing.").

**CONCLUSION**

{51}     We affirm Defendant's convictions for CSCM in the third degree (person in position of authority), CSCM in the second degree (person in position of authority),

---

[3]We note as well that Defendant's appellate counsel does not repeat the specific, and thus more troubling, claims set forth in the motion and instead states that the foreperson said only, and much more vaguely, that the jury knew that Defendant was involved in "something bigger than this." We understand that, according to Defendant's brief in chief, the State provided appellate defense counsel with an account of the conversation with the foreperson. Appellate defense counsel's failure to explain the significant difference between the jury foreperson's statement as articulated in the trial counsel's motion for a new trial and the jury foreperson's statement as articulated in the brief in chief gives us additional pause in crediting the statement in the motion.

and CDM.

{52}     **IT IS SO ORDERED.**


_____
**HENRY M. BOHNHOFF, Judge**


**WE CONCUR:**


_____
**LINDA M. VANZI, Chief Judge**


_____
**JONATHAN B. SUTIN, Judge**

31